UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.   CR 13-00751-R-2, 3, 5 |
| Plaintiff, | ) ) | ORDER DISMISSING INDICTMENT FOR DEFENDANTS CORTEZ, FLORES, AND GARMON |
| v. | ) ) | |
| JOE ROBERTS, et al., | ) ) | |
| Defendants. | ) ) | |

The government filed a three count indictment on October 18, 2013, against defendants Artuto Cortez ("Cortez"), Rene Flores ("Flores"), Randy Garmon ("Garmon"), Richard Castillo, and Joe Roberts. The indictment alleges defendants: (1) conspired to possess with intent to distribute approximately 20 to 25 kilograms of cocaine; (2) conspired to interfere with commerce by robbery; and (3) possessed firearms in furtherance of a conspiracy to possess with intent to distribute cocaine. Defendants Cortez, Flores, and Garmon pled guilty to counts two and three of the indictment.

Before sentencing, this Court ordered, on March 10, 2014, the government to provide briefing on the nucleus of events that led to the committing of the crimes, the nexus of the creation of the crimes by the government, how the reverse sting came into existence, and how and why the

confidential informants came into this case and targeted the defendants. The government's brief ("Government's Brief") on these issues, filed on March 31, 2014, was wholly inadequate because it did not address these questions or provide any information about the confidential informants. The government filed a reply brief (Government's Reply) to the defendants briefing on these same issues, which included a calendar of events that was created for this Court. Doc. No. 139 Ex. A. None of the entries in this calendar of events are signed or dated. *Id.* Because of this, the Court ordered, on April 28, 2014, the government provide further briefing with all the information available to it regarding the confidential informants, the entire history of the creation of the reverse sting, and why these defendants were targeted. The government filed a supplemental brief ("Government's Supplemental Brief") on May 5, 2014.

## I. FACTUAL BACKGROUND

The government, despite being specifically ordered to provide such information, has not provided any contemporaneous signed and dated reports from when this matter was being investigated. To the extent the government's calendar of events provides the history of this case, the accuracy of those reports is seriously called into question as they were not made contemporaneously or signed by the author.

To lure citizens into a conspiracy with the government, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent John Carr participated in a conspiracy to rob a "stash house." In this case, the stash house that Agent Carr imagined had 20–25 kilograms of cocaine, was unrelated to drug cartels, and was guarded by two "older" men. Doc. No. 139 Ex. A, at 7. Agent Carr pretended to be a courier at his imagined stash house, where he would (in his own mind) pick up a few kilograms of cocaine after a shipment came in and transport the cocaine to Las Vegas. *Id.* Agent Carr imagined himself to have financial troubles, and wanted to assemble a crew to rob his imaginary stash house. According to his plan, Agent Carr would be present at the stash house to allow his "coconspirators" entry into the stash house and provide for their escape in a vehicle that he would provide. What the evidence shows is that Agent Carr in this case was a participant in a conspiracy from which he was to receive drugs or money to pay his fictitious debt.

The government used two paid confidential informants to convince citizens to join Agent

1  Carr's scheme. CI-1 was paid $2,500 for his work in the case and CI-2 was paid $6,100. These
2  confidential informants were paid to convince individuals to meet Agent Carr and join his scheme.
3  The paid confidential informants were instructed to target individuals even if there was no
4  indication that they were involved in any kind of criminal conduct.
5      If the post arrest reports of these paid informants are to be believed, the only information
6  the government had before attempting to lure any of the defendants was that Roberts had spent
7  time in prison, and not for drug matters. Even if the paid informants' account is to be credited, the
8  government had no knowledge of what Roberts was in prison for; moreover, the government knew
9  nothing of Flores nor Garman before targeting them and knew nothing of Cortez until after his
10 arrest.
11     Once the paid informants and Agent Carr had recruited Roberts, the government used
12 Roberts to recruit the other defendants. After Agent Carr had arranged to assemble his crew, he
13 had them meet him at a warehouse and bring guns. It was at this location provided by the
14 government that Agent Carr insisted on running through a script to ensure a conspiracy had been
15 hatched. The defendants never knew of the location of Agent Carr's fictitious stash house and
16 could not have had any ability to check the stash house as to whether or not it was other than as
17 represented by Agent Carr. It was at this warehouse, after having gone through Agent Carr's
18 script, that the defendants were arrested.
19     The ATF and Agent Carr were motivated to improve their statistics for the number of gun
20 related arrests they made. In assessing the ATF's participation in this fake conspiracy, in spite of
21 the government's suggestion that Agent Carr was helping in the war on drugs, was there any
22 evidence that these arrests, as well as all other fake stash house robberies being used by the ATF
23 to get firearm arrests, helped in any fashion the war on drugs?[1]

## II.  LEGAL STANDARD

25  The Due Process Clause of the Fifth Amendment provides that no person shall "be
26 deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. V. "As
27 we have long recognized, the Due Process Clause requires us to dismiss the indictment in

---

[1] The government has provided no evidence of the ATF's role in the so called war on drugs, nor any evidence that the ATF has in fact played any role in reducing quantity of illicit drugs in this country.

'extreme cases in which the government's conduct violates fundamental fairness.'" *United States v. Black*, 11-10077, 2014 WL 1810699, at *2 (9th Cir. May 2, 2014) (Reinhardt, J., joined by Kozinski, C.J., dissenting from denial of reh'ing en banc) (quoting *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011)). "Outrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).

The Equal Protection Clause provides just that, "equal protection of the laws" for all persons. U.S. CONST. amend. XIV. When the government targets minorities,[2] without aiming at known or suspected criminals, the government runs afoul of the Constitution. "The Due Process Clause protects many of our rights, including the right be free from the use of law enforcement tactics that are inherently racially discriminatory." *Black*, 2014 WL 1810699, at *2 (Reinhardt, J., dissenting). The constitutional protections of equal protection and due process are not "mutually exclusive." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Similarly, "when the government takes aim at poor neighborhoods and tempts their residents with the prospect of making large amounts of money through criminal activity" there is a serious risk that at the government's suggestion they engage in activity they would not have otherwise. *Black*, 2014 WL 1810699, at *3 (Reinhardt, J., dissenting).

"There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so 'every case must be resolved on its own particular facts.'" *Black*, 733 F.3d at 302 (quoting *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.1986)). The Ninth Circuit has previously held that certain government conduct is outrageous. When the government creates "new crimes merely for the sake of pressing charges," it is outrageous. *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir.1987). Likewise "when the government engineers and directs a criminal enterprise from start to finish" it has crossed the line to outrageous conduct. *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir.2008) (quoting *United States v. Gurolla*, 333 F.3d

---

[2] Cortez and Flores are both Hispanic and Garmon is black.

944, 950 (9th Cir.2003)).

In evaluating whether the government's conduct is outrageous the Ninth Circuit has identified the following factors to consider: "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." *Black*, 733 F.3d at 303. The government has the burden of establishing its conduct has not violated due process. *Id.* What the evidence shows is that the government, has in this case, violated each of the considerations recognizing outrageous conduct.

## III.  DISCUSSION

The government had no reason to suspect any of these defendants before targeting them to join its fictitious scheme.

**A. The Known Criminal Characteristics and Individualized Suspicion of the Defendants**

Before recruiting these defendants, the government knew two things about them: that they were from a poor neighborhood and minorities. This was ensured by how the government used its paid informants to try to lure these men into the government's scheme. To be clear, the government was not trying to infiltrate a preexisting criminal organization nor approaching individuals already contemplating robbing a stash house. *Cf. United States v. Williams*, 547 F.3d 1187, 1200 (9th Cir. 2008) (defendant attempted to purchase 10–50 kilograms of cocaine and was planning a bank robbery, only after the defendant attempted to get the undercover agent to be the getaway driver in the bank robbery did the agent ask him to help rob a stash house); *United States v. So*, 755 F.2d 1350, 1353 (9th Cir.1985) (defendant was charged with money laundering, besides laundering an undercover agent's money, the defendant offered the agent a finder's fee to bring in other clients to launder their money).

While the government has averred that the defendants are violent narco-traffickers, this is hard to countenance with a straight face. For instance, defendant Cortez had three prior misdemeanor convictions: driving with a suspended license, possession of under an ounce of

marijuana, and criminal threats. These offenses hardly arise to the level of violent "recidivist career criminals" that the government argues. Gov't Brief 16. More importantly, the government was not even aware of Cortez's criminal history until after he was arrested for the crime. The other defendants also have no history of armed robbery or drug trafficking. If we were to accept the government's absurd proposition that prior drug possession was proof of a propensity for drug trafficking, then the current President of the United States, at least one former President, and at least one judge being considered for appointment to the Supreme Court of the United States would ostensibly, according to the government's theory, be just the types with the propensity to be narco-traffickers.

Besides not knowing anything about these defendants' criminal characteristics, having no individual suspicion of them, nor having any links connecting them to an ongoing criminal enterprise, the government targeted these defendants. The government's inducement of a $600,000 payout, to residents of a poor neighborhood, "may lead astray otherwise law abiding young men living in poverty, and motivate them to make false or exaggerated claims about their qualifications to serve as participants in the proposed venture—including claims about prior criminal experience that lack any substantial basis in truth." *Black*, 2014 WL 1810699, at *3 (Reinhardt, J., dissenting). Targeting poor and minority citizens, without any individualized suspicion, presents the grave "danger of arbitrary enforcement" of the laws that both the due process and equal protection clauses prevent. *See United States v. Armstrong*, 517 U.S. 456, 483 (1996) (Stevens, J., dissenting). "The manifest danger of racial discrimination inherent in the law enforcement tactics used here is an important part of why 'random,' suspicionless dragnets that test people for their willingness to break the law are offensive to the Constitution." *Black*, 2014 WL 1810699, at *2 (Reinhardt, J., dissenting).

Can there be any serious concern that these defendants "would embark on a career of robbing stash houses?" *United States v. Kindle*, 698 F.3d 401, 416 (7th Cir. 2012)(Posner, J., dissenting). The loud answer is NO!

///

///

**B. The Government's Role in Creating the Crime, Encouraging the Defendants, and Participation in the Offense Conduct**

Just as important as the government's complete lack of a basis to target the defendants, the government created the fictitious crime from whole cloth. Agent Carr was the only integral part of the conspiracy to rob his fictitious stash house from the beginning. Agent Carr invented the amount of cocaine present, making his planned robbery worth approximately $600,000. He invented the two old men guarding the fictitious stash house, that they were armed, and thus the need for the defendants to bring guns. Although Agent Carr may never have said the phrase "make sure you bring guns,"[3] he told the defendants that the two men guarding the stash house were armed and that he could not get the guns. When the defendants brought guns to the warehouse, they merely did so as part of Agent Carr's plan. Agent Carr was to provide the getaway car and be at the fictitious stash house to let his coconspirators through the door.

Despite the government's argument that the defendants planned the crime, Agent Carr controlled all the details, communicating that the defendants would need to bring guns, detailing how they would enter the fictitious stash house, and how they would get away. Agent Carr insisted that he would be at the fictitious stash house during the robbery and that he would open the door for the defendants. When Agent Carr said he wanted to meet everyone at the warehouse to plan the robbery, Roberts said that there was no need and he would just show the others Agent Carr's photograph, but Agent Carr insisted that he meet everyone to go exactly over the plan. Doc. No. 139 Ex. A, at 8. Once at the warehouse, Agent Carr insisted on running through a script to ensure there was a conspiracy.[4] Moreover, none of the defendants even knew of the location of the fictitious stash house. Without Agent Carr there could have been no agreement at all.[5]

The government's crime is a lie and a falsehood. Agent Carr was lying to the defendants the whole time. Everything Agent Carr said was part of his fraud on the defendants. If Agent Carr was not acting on behalf of the government, he could be charged for fraud for his scheme. Agent

---

[3] It was actually the paid informant that asked Roberts if he had "toys" (slang for guns), and ensured that he would bring them. Doc. No. 139 Ex. A, at 9.
[4] This meeting at the warehouse, where Agent Carr made sure to record each defendant agreeing in some way, was the "crime," itself, which is the basis of the government's indictment.
[5] And Agent Carr would get his firearm arrest statistics for the ATF.

Carr for all purposes planned the robbery and the conspiracy from beginning to end. The government argues he did not tell the defendants how to do their part, but their part was only agreeing to go along with Agent Carr. Agent Carr told them the details of the targeted fictitious stash house, that he would let them in, provide the vehicle, and told them of the obstacles they would encounter. The only thing Agent Carr did not provide them with was guns. However, Agent Carr and the ATF needed to have the arrests for guns, and it was not the defendants who asked about the need of guns. But the crime that the defendants were indicted for was conspiracy, which Agent Carr was most definitively an active conspirator, the ring leader, and orchestrator of the whole agreement. But despite Agent Carr's integral part as the mastermind of the conspiracy who was in charge of all the details, the government did not indict him. Agent Carr encouraged all the defendants to agree to his fictitious plot; at the warehouse, Agent Carr's carefully orchestrated script ensured he would get the defendants to agree. Thus the government's role in creating, encouraging, and participating in this conspiracy was pervasive from beginning to end.

Moreover, had the defendants actually robbed a real stash house, regardless of their aspirations, and there was only one kilogram of cocaine at the real stash house, they could only be charged with possession of that one kilogram of cocaine. That Agent Carr was able to lie about all the details of the crime—the 20–25 kilograms of cocaine,[6] the necessity to bring guns—then use those fictitious details so that the government can indict the defendants for a crime with a much greater mandatory minimum sentence, is outrageous. It would be unconscionable for this court to condone and sanction the government's fraud in this case.

**C.  Nature of the Crime Being Pursued**

It is unclear why the ATF, which has no authority over illicit drugs, is trying to ensnare citizens in its fictitious stash house robberies. Further, the government has provided no evidence that there have been any stash house robberies in Southern California nor any evidence of the necessity of trolling poor neighborhoods to ensnare its poor citizens. "[T]he government cannot bootstrap . . . post hoc knowledge to justify this scheme from the beginning." *United States v.*

---

[6] Agent Carr goes back and forth between telling the defendants there will be 20–25 kilograms and 20–25 pounds of cocaine. Doc. No. 139 Ex. A, at 7. This is indicative of the inaccuracy of these reports as a whole, and further highlights the true arbitrariness of the amount of drugs charged in the indictment.

*Hudson*, 13-0126, 2014 WL 960860, at \*6 (C.D. Cal. March 10, 2014).

  To the extent that the government is vigorously fighting the so called war on drugs, the ATF's reverse stings work to the opposite effect. As Judge Posner explained:

> And now consider the role of such stings in the "war on drugs." Are they likely to reduce the sale and use of illegal drugs? No; they are likely to have the opposite effect. Stash house robbers do not increase the amount of drugs in circulation, since they steal their drugs instead of making or importing them. The effect of a fictitious stash house sting, when the person stung is, unlike [the defendants], a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses—security obtained at no cost to the operators of stash houses—reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers.

*Kindle*, 698 F.3d at 416 (7th Cir. 2012) (Posner, J., dissenting). Even if the government were targeting potential robbers of stash houses, unlike in the instant case, the government would not be reducing the supply of drugs, but only making drug trafficking more profitable.

  When the government trolls through poor neighborhoods to tempt people to engage in criminal conduct that they would not have otherwise, it steers too close to tyranny. As Judge Reinhardt warned: "Certainly, such tactics create a relationship between government and governed at odds with the premises of our democracy—a relationship more like that depicted in George Orwell's 1984 or Philip K. Dick's The Minority Report." *Black*, 2014 WL 1810699, at \*4 (Reinhardt, J., dissenting). It is impermissible to use these tactics against unprotected citizens entitled to the constitutional rights they deserve.

  The government's tactics here, in creating its own criminal enterprise, in which it is the ringleader, then ensnaring individuals it has no reason to suspect of being in that enterprise violates the Due Process Clause. "The Due Process Clause forbids the tactics used here not only on grounds of equality and fairness, but also because widespread use of such law enforcement practices would chill the exercise of many of our liberties." *Id.* That the government targets minorities in poor neighborhoods with huge payouts in the hundreds of thousands of dollars, then

///

1  seeks life sentences to those that fall into its web, is so outrageous as to offend the basic sense of
2  justice.
3        IT IS HEREBY ORDERED that indictment is dismissed as to defendants Cortez, Flores,
4  and Garmon.
5  Dated:  May 30, 2014.

                                                                MANUEL L. REAL
                                         UNITED STATES DISTRICT JUDGE